UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JAMES J. ELLIS )
 )
V. ) NO. 2:13-CV-194
 )
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation following the administrative denial of the plaintiff application for disability and disability insurance benefits under the Social Security Act after a hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 14 and 18].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff filed his application for benefits on August 24, 2010, and alleges a disability onset date of January 1, 2003. The plaintiff's "insured status" regarding his eligibility for disability insurance benefits expired on March 31, 2004, meaning that there is a six year gap between the expiration of his insured status and the beginning of the administrative process. At that time he was 51 years of age, or "closely approaching advanced age." He has a high school education. There is no dispute he cannot return to any past relevant job.

In order to establish eligibility for disability insurance benefits, the plaintiff must prove that he was disabled within the meaning of the Act on or before March 31, 2004, when his insured status expired.

Plaintiff's medical history is, with the exception of the omission of the opinions of state agency physicians and psychologists, summarized in his brief as follows:

> Plaintiff has received medical treatment through the Veterans Administration Medical Center (VAMC) since at least September 9, 1997 (Tr. 258). On September 11, 1997 Plaintiff was given diagnoses of homeless, Bipolar Disorder, bilateral cataracts, dermatitis left hand, S/P extensor tendon surgery left hand, THC dependence, R/O PTSD from childhood (Tr. 256). Plaintiff returned on September 30, 1997 with reports of severe anxiety, paranoia, and panic (Tr. 251). On October 9, 1997, Plaintiff reported being evaluated at Duke University for his left hand (Tr. 246). The following day, Plaintiff reported auditory hallucinations (Tr. 242). Plaintiff continued treatment through this location (Tr. 220-246).
> On May 19, 1998, Plaintiff was seen at the VAMC and reported a history of suicidal

2

thoughts (Tr. 343). On May 25, 1998, it was reported that Plaintiff "isolates the majority of the time from others" (Tr. 338). From June 1998 through July 22, 1999 Plaintiff continued with regular psychiatric treatment for mental health issue and drug detoxification (Tr. 301-335).

On July 22, 1998, Plaintiff returned to the VAMC and was seen by the orthopedic clinic for reported chronic right elbow pain (Tr. 300-301). The impression was given as neuroma of the right elbow (Tr. 301). On October 1, 1998, Plaintiff underwent an imaging study of the right elbow (Tr. 707-708). The impression from this study noted very early degenerative changes of the elbow (Tr. 708).

On December 12, 2001, Plaintiff reported to Raleigh Orthopaedic Clinic, Dr. Sarah DeWitt (Tr. 354-356). The chief complaint was noted as right $1_{st}$ MTP pain (Tr. 354). Plaintiff's history was noted to include a right Keller arthroplasty at the VA hospital three years prior, an attempt to fuse without bone graft in December 2000 and in March 2001 was treated with an iliac crest bone graft from his hip (Tr. 354). Reduced range of motion, tenderness, and mild swelling were noted on physical examination (Tr. 355). The impression was given as (1) Right MTP fusion failure post-Keller, status post three operations, (2) Smoker, (3) Bipolar Disorder (Tr. 355). The doctor recommended surgery with a "redo" iliac crest bone graft that would require either a plate or multiple pins and smoking cessation (Tr. 355). Plaintiff returned for pre-op appointment on December 19, 2001 (Tr. 357-359). Plaintiff was instructed by Dr. DeWitt that he would need to be completely off nicotine for 30 days prior to surgery (Tr. 357). Imaging studies revealed "..$1_{st}$ MTP non-union with a radial lucent line where the joint is" (Tr. 359). On January 21, 2002, Plaintiff underwent surgery which included hardware removal from right first MTP and a redo fusion with interposition iliac crest bone graft and percutaneous pinning (Tr. 397-399). Plaintiff follow up with Dr. DeWitt on January 30, 2002 and indicated having some pain in the hip and foot, particularly when he puts the foot dependent, and was instructed to continue non-weight bearing for three more weeks (Tr. 363). Plaintiff followed up again on February 6, 2002, February 20, 2002, and February 27, 2002 (Tr. 364-366). On April 1, 2002 Plaintiff returned and report ankle pain (Tr. 368). The doctor's plan included gradually increasing patient's weight bearing. On April 24, 2002 Dr. DeWitt noted for Plaintiff to be weight bearing as tolerated (Tr. 370). The doctor noted that imaging study did not show that Plaintiff was completely healed (Tr. 370). Plaintiff returned again on July 24, 2002 with complaints of continued pain in the toe and swelling (Tr. 371). The impression was given as delayed union of the right MTP fusion (Tr. 371). On September 25, 2002, Plaintiff was noted as being "very dissatisfied and unhappy with his foot" (Tr. 372). The main complaint was swelling. Plaintiff was noted to have used a bone stimulator, but this resulted in significant swelling. The impression was given as left first MTP delayed union status post four prior surgeries, but stable and clinically improved and second MTP synovitis related to the shortened first ray and bearing weight on that side of his foot (Tr. 372).

Plaintiff returned to Dr. DeWitt's office on October 9, 2002 and reported a recent fall resulting in significant pain and swelling (Tr. 373). The doctor's impression was given as: 1) Concern over fracture though the fusion site, and 2) Preexisting delayed union "but that looked more healed than it does on today's x-rays on prior x-rays" (Tr. 373). On October 30, 2002 continuing pain was noted with a change in the range of motion in the MTP joint (Tr. 374). A CT scan indicated the fusion was not united (Tr. 374). The

3

impression was given as Left first MTP nonunion of fusion complicated by a recent traumatic injury which seems to have increased the gross motion on examination and had dramatically increased the pain in the area (Tr. 374). Work restrictions were noted by the doctor as "The patient is limited to mostly sedentary work at this point with short distance walking allowed" (Tr. 374). The doctor concluded the report from this visit by stating "The injury with the increased motion at the nonunion site is of concern". Plaintiff again returned to Dr. DeWitt on November 27, 2002 and was reported to be "doing poorly" (Tr. 375). Following examination, Dr. DeWitt recommended Plaintiff go to a pain clinic due to being unable to control the discomfort (Tr. 375). Plaintiff was reported to have been terminated from his job. Dr. DeWitt further noted that Plaintiff work restrictions would be for unlimited sedentary work and walking for short distances and standing for only short periods (Tr. 375). Plaintiff returned for measurement of total contact orthotic and in-depth footwear on December 16, 2002 (Tr. 377). The diagnosis was given as first MTP nonunion with a secondary break (Tr. 377). Plaintiff received the orthotics / shoes on January 10, 2003 (Tr. 380).

    Plaintiff returned to Dr. DeWitt on January 14, 2003 (Tr. 381). Plaintiff reported experiencing pain in his right foot that resulted in a fall with injury to the right elbow (Tr. 381). Physical examination resulted in pain. Imaging studies of the right elbow and right wrist were normal (Tr. 381). Plaintiff returned to Dr. DeWitt on January 29, 2003 with continued reports of pain (Tr.384-385). The doctor stated "He and I discussed at length today that his best option at this point is if we can get him comfortable with accommodative shoes and with pain management, that then he would require no further surgical intervention" (Tr. 384). The doctor follow up by indicating that if this did not occur, then a "re-do" surgery would be required, but the doctor noted that before this would happen, Plaintiff would need to get a second opinion (Tr. 384). Work restrictions were again noted as "mostly sedentary" (Tr. 385). On February 25, 2003 Plaintiff returned and report continuing pain in the right upper extremity (Tr. 386). Plaintiff was also noted as having an appointment for a second opinion, concerning the foot, with Dr. James Nunley at Duke (Tr. 386). Plaintiff was noted to have seen Dr. Nunley and that doctor had recommended a redo fusion with plate and/or external fixator (Tr. 387). Dr. DeWitt expressed concern over the history of skin necrosis and therefore personally called and spoke with Dr. Nunley (Tr. 388). After speaking with Dr. Nunley, Dr. DeWitt's plan was to redo the fusion and requested authorization from worker's compensation (Tr. 388).

  On April 23, 2003 and May 14, 2003, Plaintiff returned to Dr. DeWitt with continued reports of right elbow pain (Tr. 389-391). Plaintiff was given injections and noted to have started physical therapy (Tr. 389-390). Work restrictions were given as lifting no more than five pounds on the right upper extremity and only being able walk and stand for short durations (Tr. 391).

    On May 20, 2003, Plaintiff was evaluated by Dr. Joel Krakauer, also with Raleigh Orthopaedic Clinic, for the right elbow pain (Tr. 392). Tenderness, pain and minimal swelling were noted on physical examination. Dr. Krakauer's impression was of chronic lateral epicondylitis, right (Tr. 392). On July 1, 2003 Plaintiff reported continued pain in the right elbow (Tr. 394). Dr. Krakauer noted that Plaintiff has had extensive nonoperative treatment for the lateral epicondylitis, including injections, therapy, and rest, but continues to have marked pain (Tr. 394). Treatment options were discussed with

4

a consensus of proceeding with surgical intervention (Tr. 394).

Plaintiff returned to Dr. DeWitt on January 28, 2004 (Tr. 396). Plaintiff indicated that he had settled his worker's compensation claim and had been approved for treatment at a pain clinic (Tr. 396). Dr. DeWitt had previous indicated the need for this, but worker's compensation originally denied the request (Tr. 395). During the January 28, 2004 visit, Plaintiff reported improvement in his condition (Tr. 396). Plaintiff indicated that he had started to see improvement in his elbow and was likely not going to seek surgical intervention. It was also reported that "regarding his foot, he said it is as good as it has ever been, but it is still painful on a daily basis with weight bearing" (Tr. 396). Plaintiff reported to Dr. DeWitt that he did want to have surgery done on his foot in the future, but was not prepared to do it at that time (Tr. 396).

Plaintiff was seen on December 11, 2008 at Healing Hands (Tr. 510). Among the reported conditions was lower back pain with radiation of pain down the leg (Tr. 510). Plaintiff returned to this doctor on January 16, 2008 with continued reports of back pain (Tr. 510). Reference to a MRI of the back was made during this visit.

On January 23, 2009, Plaintiff reported to the Bristol Regional Medical Center with back pain (Tr. 431-438). Plaintiff underwent a MRI of the lumbar spine (Tr. 437-438). The impression included left disc bulge at L4-5 which was noted as being fairly pronounced and indenting the dural sac, but without nerve root impingement (Tr. 438). Plaintiff had previously had another MRI of the lumbar spine completed at this location on December 17, 2008 (Tr. 487-488). That imaging study indicated moderate multi-level degenerative changes (Tr. 488).

On March 12, 2009, Dr. Dave Arnold referred Plaintiff to Dr. Danny Mullins at Appalachian Orthopaedic Associates to further assess reported shoulder pain (Tr. 446, 503). Plaintiff was seen by Dr. Mullins on March 13, 2009 (Tr. 444). Impacts of the shoulder pain were reported to significantly disrupt activities, including combing hair and brushing teeth (Tr. 444). On physical examination, positive impingement was noted with forward flexion, abduction and internal rotation (Tr. 444). Plaintiff was noted to be unable to do "a lift off type test" and unable to get his hand around behind to lumbar region (Tr. 444). Plaintiff followed up with Dr. Mullins on March 25, 2009, following a MRI of the right shoulder (Tr. 442-443, 457-458). Injections and therapy were recommended (Tr. 442-443).

Plaintiff returned to Dr. Arnold at Healing Hands on July 28, 2009 with continued reports of shoulder pain (Tr. 501-502). In addition to shoulder pain, Plaintiff also indicated worsening of pain in the neck, mid back, hands, knees, and ankles (Tr. 502). The assessment included "possible psoriatic arthritis.." (Tr. 501). On July 30, 2009, Plaintiff reported to Bristol Regional Medical Center where imaging studies were performed on the cervical spine, right hip, hands, and knees (Tr. 449-456). Among the findings, were moderate multilevel degenerative changes of the cervical spine (Tr. 453-454). Pain and arthritis were among the conditions noted on multiple return visits through September 21, 2010 (Tr. 491-500). On September 21, 2010, Plaintiff returned to Dr. Arnold and reported an increase in back, hip, knees, and neck pain (Tr. 491). The plan included an increase in Lortab along with consideration of trochanteric injections (Tr. 491).

On November 15, 2010 Plaintiff attended a consultative examination with Dr. Samuel D. Breeding (Tr. 549-551). Chief complaints included pain from arthritis and bipolar

5

disorder/agoraphobia (Tr. 549). In the musculoskeletal section of the physical examination lumbar forward flexion was 45 degrees, extension was zero degrees, range of motion of all other joints appeared normal, but somewhat guarded and slow (Tr. 551). Dr. Breeding opined to Plaintiff being limited to lifting 30 pounds occasionally, sitting four to six hours in an eight-hour day, standing at least two hours in an eight-hour day, and may need to sit or stand as needed for comfort (Tr. 551).

On November 18, 2010, Plaintiff was seen by Anna Palmer, MS, SPE for a psychological evaluation (Tr. 552-557). The evaluation procedure included a clinical interview with a mental status exam. The examiner gather information from general observations, personal and family history, academic and vocational history, medical history, mental health history, mental health history, mental status, current signs and symptoms, activities of daily living, ability to relate, and mental capability (Tr. 552-557). During the course of this examination, the examiner noted "He is not seen as exaggerating his symptoms for the purpose of gaining disability benefits" (Tr. 554). The concluding sections of the report were assessment of ability to perform work-related activities and diagnostic impression (Tr. 555-556). The examiner stated "His concentration and persistence are likely to vary widely due to bipolar disorder, and are likely to be markedly impaired at times of significant mania or depression" (Tr. 555). Marked impairments were also noted in decision making ability and ability to interact with others in an appropriate manner during manic episodes (Tr. 555). Plaintiff was additionally unreliable in meeting the demands of work-related decisions and "His physical problems may detract from his ability to maintain attendance and meet an employment schedule" (Tr. 555-556). The diagnostic impression included bipolar I disorder, most recent episode unspecified (Tr. 556).

On March 3, 2011, Plaintiff reported to the Bristol Regional Medical Center with chronic neck pain (Tr. 597-600). On March 21, 2011, an imaging study of the cervical spine was again obtained (Tr. 605-606). The impression was given as annular bulging at C5-C6 and C6-C7 without frank central canal stenosis or extruded disc herniation, bilateral mainly bony neural foraminal narrowing at C6-C7 and to a lesser extent C5-C6, and minor annular deformity at C2-C3 and C4-C5 (Tr. 606).

On April 5, 2011, Plaintiff was evaluated at the VAMC (Tr. 608-612). The primary complaint included neck pain with radiation into the right arm (Tr. 609). The concluding assessment was of cervical neck pain with right radiculopathy and arthritis (Tr. 610).

Plaintiff returned to Dr. Arnold on July 26, 2011 and September 27, 2011 (Tr. 841-843). Continued back pain was again reported with "LBP" included as an assessment (Tr. 841-842).

Plaintiff reported to Holston Medical Group on September 15, 2011 (Tr. 866). Pain was reported in the back and multiple joints (Tr. 866). The overall assessment was given as arthritis, essential hypercholesterolemia, and bipolar disorder (Tr. 868). Chronic pain was given in the assessment on January 18, 2012 (Tr. 850).

[Doc. 15, pgs. 2-9].

As stated above, the plaintiff's summarization of the relevant medical and

psychological evidence does not include the evaluations of the evidence by the non-examining state agency personnel. Also, Dr. Theron Blickenstaff testified as a medical expert at the administrative hearing. The opinions of the state agency doctors and Dr. Blickenstaff are summarized in the defendant's brief as follows:

> State agency medical and psychological consultants subsequently reviewed the record, and provided opinions as to Plaintiff's impairments prior to March 31, 2004. On December 9, 2010, Dr. Brad Williams, a state agency psychiatrist, reviewed the record and found that Plaintiff's mental impairments resulted in mild limitations (Tr. 558, 568, 570). Dr. Williams concluded that there was no mental health evidence for the period between Plaintiff's alleged onset date and the date last insured (Tr. 570). Dr. Williams reviewed Dr. Palmer's examination report and determined that her proposed marked limitations during manic episodes were based on Plaintiff's self-reports (Tr. 570). Dr. Williams opined that Plaintiff had opted not to be under mental health treatment for years and there was no documentation of manic episodes (Tr. 570). Dr. Williams opined that Plaintiff appeared less than candid with Dr. Palmer by not reporting polysubstance dependence as documented in the VA treatment notes (Tr. 570). Dr. Williams noted Plaintiff's credibility was suspect (Tr. 570). Dr. Williams noted how Dr. Palmer's examination showed no evidence of impaired concentration/attention or an inability to relate (Tr. 570). Dr. Williams opined that, given the lack of medical evidence that supports a severe mental component, "it appears the actual mental limitation would be nonsevere" (Tr. 570).
> On January 19, 2011, Dr. Jim Scott, the state agency physician, reviewed the record and found that Plaintiff could perform the exertional demands of light work, including the ability to stand up to 6 hours in an 8-hour day, but noted the record was insufficient to support a Title II claim during the period between January 1, 2003, and March 31, 2004 (Tr. 579, 581-82, 587). On April 13, 2011, Dr. Kimberly Tartt-Godbolt, a state agency psychologist, reviewed the record and opined that "[t]here is insufficient evidence in the [medical evidence of record] to support functional limitations during the [date last insured] period of 1/1/2003 – 03/31/2004" (Tr. 613, 625).
> At the March 2012 administrative hearing, Dr. Theron Blickenstaff was called to testify as a medical expert (Tr. 50). Dr. Blickenstaff stated "the record doesn't really have an examination that relates very well to [the] ability to walk," and discussed the findings from Dr. Breeding's November 2010 examination (Tr. 51). He testified that Plaintiff was limited to standing or walking for no more than 4 hours in an 8-hour day as of March 31, 2004 (Tr. 51).

[Doc. 19, pgs. 6 and 7].

At the administrative hearing, the ALJ took the testimony of Dr. Robert Spangler, a

7

Vocational Expert ["VE"]. The ALJ asked Dr. Spangler to assume an individual of plaintiff's age, education and vocational experience. He asked him assume the person "could do light work with occasional posturals, no ropes, ladders, scaffolds, avoid all exposure to hazards..." who was limited to unskilled work, and who would have an option to sit or stand while working. The vocational expert identified 782, 040 jobs in the national economy and 16, 556 in the State of Tennessee that such a person could perform. If that person were limited to sedentary work, there would be 428,552 national and 9,297 regional jobs. (Tr. 53-54).

The ALJ rendered his hearing decision on April 18, 2012.[1] He found that the plaintiff had severe impairments of a right foot impairment following four surgeries on that foot and a right wrist contusion. Although he found that the plaintiff did not have a severe mental impairment, he accounted for its claimed existence by limiting the plaintiff to unskilled work. He based this finding upon the opinions of Dr. Williams and Dr. Castillo that the plaintiff's mental impairments were non-severe due to a lack of mental health evidence in the record during the period plaintiff was insured. He gave these opinions "great weight." He also gave great weight to state agency psychologist Dr. Tartt-Goldbolt who opined that while the plaintiff may have some significant limitations now, there was insufficient evidence in the medical evidence to support functional limitations during the period plaintiff was still eligible for benefits. (Tr. 28 and 625).

---

[1]Due to the fact that the application was not filed until more than 6 years after the last date plaintiff was insured, the ALJ was faced with the additional hurdle that the farther removed from that date that medical evidence entered the record, the less likely it could be that the evidence would reliably indicate plaintiff's capabilities during the time he was insured.

The ALJ found that the plaintiff did not have a listed impairment. He then found that plaintiff had a residual functional capacity ["RFC"] to perform light work, could never climb ladders, ropes or scaffolds, could occasionally perform all other postural limitations, had the option to sit or stand at will while avoiding all exposure to hazards and being limited to unskilled jobs. (Tr. 29).

The ALJ then evaluated the plaintiff's credibility, and found his subjective complaints to be less than credible. He based this upon a variety of factors, including the plaintiff's asserted daily activities. He also pointed out the fact that the plaintiff failed to mention problems with substance abuse to his consultative psychological examiner. He also noted the plaintiff criminal history, which included arrests for writing bad checks and for aiding and abetting in a bank robbery. (Tr. 30).

The ALJ then discussed the medical evidence and assigned weight to the consultative physicians and the plaintiff's treating doctor. He gave some weight to state agency physician Scott, although the ALJ found the plaintiff required a sit stand option whereas Dr. Scott found the plaintiff could stand and/or walk for six hours and sit for six hours in an eight hour workday. He gave little weight to Dr. Blickenstaff and Dr. Breeding. He also gave little weight to the treating physician Dr. DeWitt because the other evidence indicated a higher level of function than very limited standing and walking and lifting of no more than 5 pounds with his right arm opined by her. (Tr. 30-31).

Based upon the testimony of Dr. Spangler, the VE, the ALJ found there was a significant number of jobs which the plaintiff could perform. Accordingly, he found that plaintiff was not disabled. (Tr. 32-33).

9

Plaintiff first argues that the ALJ's RFC finding is not supported by substantial evidence because "the ALJ, at least partially, rejected every medical source opinion contained in the record that opined to physical limitations." Particularly, he takes issue with the weight accorded to Dr. DeWitt, his treating physician, not only because she is such, but also because her's was the only opinion during the time period at issue.

While it is true that Dr. DeWitt rendered her opinion during the time period between the alleged disability onset date of January 1, 2003, an the expiration of plaintiff's insured status on March 31, 2004, this does not mean that later evidence cannot support the ALJ's finding. It is true that Dr. Breeding and Dr. Blickenstaff opined that plaintiff was limited in standing and walking to less than a full range of light work, which would require at least 6 hours of standing or walking. However, *the ALJ added to his RFC an unrestricted option to perform work sitting or standing at the plaintiff's discretion*. This certainly accommodates those two physicians' opinions in that regard even if the ALJ stated he gave them little weight.

Also, the opinion of Dr. Scott, the state agency physician, indicated that plaintiff could perform the standing and walking requirements of light work nearly 7 years *after* the plaintiff's insured status expired. The ALJ found that the plaintiff was *more* restricted than Dr. Scott. In any event, it was certainly not the fault of the Commissioner that there was a six year delay in plaintiff's filing for benefits, but even though that is true, the fact that these opinions from 2010 and 2011 exist, and that they were allowed for in the RFC finding, greatly diminishes the legitimacy of plaintiff's argument. There was thus certainly evidence in the record which the ALJ as the trier of fact could give credence to in making his RFC

10

finding.

Finally, the ALJ was not required to accept the entire opinion of any physician, so long as he had strong evidence to support each facet of his RFC finding. As stated, he found the plaintiff more restricted than some and less than others, but there is evidence for all components regarding plaintiff's physical limitations.

Plaintiff also argues that the ALJ erred in not finding that the plaintiff had a severe mental impairment during the relevant time period. It is true that the ALJ apparently rejected Dr. Palmer's consultative examination. It is also true that he did not discuss the weight he gave Dr. Palmer. However, Dr. Palmer's opinion, based largely upon the plaintiff's subjective complaints, was considered by the state agency psychologists who *did* discuss their takes on her opinion. Both Dr. Williams and Dr. Tartt-Godbolt opined that there was no evidence during the time between the disability onset date and the expiration of plaintiff's insured status to show he had a severe mental impairment *during that time period.* The opinion of Dr. Williams in particular could provide substantial evidence that the plaintiff did not have a severe mental impairment at the time of the ALJ's decision, and even more so for the time 7 years earlier when plaintiff's insured status expired.

The Court finds that there is substantial evidence to support the RFC assessment, and that the ALJ committed no reversible error in the adjudicative process. It is therefore respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 14] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 18]

11

be GRANTED.[2]

                                Respectfully submitted,

                                                      s/ Dennis H. Inman
                                                 United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

12

Case 2:13-cv-00194-JRG-DHI   Document 20   Filed 09/04/14   Page 12 of 12   PageID #: 993